IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ANDREA LYNN NICKLOW, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Civil Action No. 05-1290 |
| | ) |
| JO ANNE B. BARNHART, | ) |
| COMMISSIONER OF SOCIAL | ) |
| SECURITY, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION

### I. INTRODUCTION

Plaintiff, Andrea Lynn Nicklow, seeks judicial review of a decision of defendant, Jo Anne B. Barnhart, Commissioner of Social Security ("the Commissioner"), denying her applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI, respectively, of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. Presently before the Court are the parties' cross-motions for summary judgment pursuant to Fed.R.Civ.P. 56. For the reasons set forth below, the parties' cross-motions for summary judgment will be denied and the matter remanded to the Commissioner for further consideration of plaintiff's claim of disability commencing December 8, 2002.

## II. Background

### A. Procedural History

In December 2003, plaintiff filed applications for DIB and SSI alleging disability since November 1, 2000 due to a pinched nerve, herniated and ruptured discs, arthritis and tears in her knees, asthma and chronic pain in her spine, neck, head, knees and right leg. (R. 127-29, 154, 442-45). Plaintiff's applications were denied by the Social Security Administration on March 23, 2004, and plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). (R. 111-17).

A hearing was held before ALJ Randall Moon on January 13, 2005. Plaintiff, who was represented by counsel, and a vocational expert ("VE") testified at the hearing. (R. 31-109). On May 13, 2005, the ALJ issued a decision denying plaintiff's applications for DIB and SSI. Specifically, the ALJ concluded that, considering plaintiff's age, education, work history and residual functional capacity ("RFC"),[1] plaintiff was able to perform a significant number of jobs existing in the national economy at the light exertional level during the period November 1, 2000 through September 1, 2002 and since December 8, 2002, despite several severe impairments. Therefore, she was not disabled. (R. 15-28).

---

[1]RFC is defined in the Social Security Regulations as the most a claimant can still do despite his or her limitations. *See* 20 C.F.R. §§ 404.1545 and 416.945.

2

Plaintiff's request for review of the ALJ's decision was denied by the Appeals Council on August 12, 2005. (R. 6-8). This appeal followed.

## B. Facts

Plaintiff's testimony at the hearing before the ALJ on January 13, 2005 may be summarized as follows:

Plaintiff's date of birth is February 24, 1973. She was 31 years old at the time of the hearing. Plaintiff is 5'10" tall, and she weighs 212 pounds. In the year preceding the hearing, plaintiff lost 45 pounds, which she attributed to depression and fatigue.[2] Plaintiff resides with her two children in a two-story house.[3] (R. 36-38).

Plaintiff has a driver's license, and she drives on a daily basis to transport her daughter to school because she misses the bus "most of the time." When it is necessary to take her son along, plaintiff's mother usually accompanies plaintiff to lift the son in and out of his car seat, which is difficult for plaintiff to do. Otherwise, plaintiff's mother babysits the

---

[2]Plaintiff testified that she gets depressed because, due to her medical conditions, she cannot play with her children like other mothers, she cannot take care of her house, and she cannot do the laundry, take out the garbage or go shopping by herself. (R. 62-63). With respect to treatment for depression, plaintiff testified that she sees a psychiatrist once a month and a therapist every two weeks, and she takes Zoloft. (R. 64).

[3]At the time of the hearing, plaintiff's daughter was 9 years old and her son was 2 years old. (R. 37).

little boy while plaintiff drives her daughter to school. (R. 39-40).

With respect to education, plaintiff graduated from high school and she completed approximately two years of college. Plaintiff also has some vocational training. Specifically, plaintiff took courses for three years in high school to learn to repair electronics, such as televisions and VCRs, although she has never utilized this training in an employment setting. (R. 41-43).

Turning to work history, from September 2002 to December 2002, plaintiff was employed as an internet bank agent, which involved answering telephone calls from customers concerning their bank accounts. In this job, plaintiff sat most of the day, and she did not have to lift heavy items. Plaintiff voluntarily left this employment because she missed too much time due to back pain.[4] (R. 43-44).

Prior to her employment as an internet bank agent, plaintiff worked for Peer Group for 14 or 15 months setting up medical conferences for physicians to discuss new medications that had become available. This job involved sitting most of the day,

---

[4]Plaintiff testified that she would begin to experience back pain on the job after sitting for "an hour or so," which was exacerbated by the additional weight plaintiff was carrying due to her pregnancy with her son. On December 16, 2002, nine days after plaintiff voluntarily left this employment, her son was born. (R. 41, 45).

4

although plaintiff frequently was required to go up and down stairs because her work station was on the second floor of the building in which she worked.[5] While she was working for Peer Group in 2001, plaintiff attended college classes on Monday, Wednesday and Friday evenings. (R. 46-47). Before plaintiff worked for Peer Group, she worked as a sewing machine operator, a telemarketer for vacation packages and a baker, waitress and hostess for Eat'n Park Restaurant. (R. 48-50).

Plaintiff alleges that she is unable to work due to throbbing pain throughout her lower back, a sharp pinching sensation in her right hip which radiates down the side of her leg to her toes and numbness from the right knee down to the ankle. At the time of the hearing, plaintiff had seen Dr. Frost at the Jefferson Pain Clinic for pain management and spinal injections on two occasions. Although the spinal injections did not relieve plaintiff's pain, they provided plaintiff with "a little bit more mobility." Specifically, after an injection, plaintiff could bend over and touch the floor. In the past,

---

[5]Plaintiff offered conflicting testimony concerning the reason she left her employment with Peer Group. Initially, plaintiff testified that she left this employment because she missed a lot of work due to back pain and she had difficulty going up and down the stairs at work. (R. 46-47). Subsequently, in response to questioning by the ALJ, plaintiff testified that she left this employment to move to Texas with her boyfriend where she resided from February 2002 to June 2002, when she returned to Pennsylvania. (R. 86-87).

5

several different medications have been prescribed for
plaintiff's back and knee pain.[6] At the time of the hearing, she
was taking time-released Vicodin every 8 hours for pain relief.[7]
(R. 55-59).

On April 4, 2003, Dr. Kandabarow performed surgery on
plaintiff's back for two bulging discs and a ruptured disc.
Immediately after the surgery, plaintiff was pain-free. However,
the pain returned within two weeks, and, at the time of the
hearing, plaintiff's back pain was worse than before surgery.
(R. 83). Pain from plaintiff's back and hip interfere with her
ability to sleep through the night. (R. 85).

As to activities of daily living, plaintiff's "life consists
of staying at home" because her medical conditions preclude her
from engaging in activities with friends, such as bowling and
skating. (R. 65). Typically, plaintiff rises at 6:00 a.m. and
takes a hot bath to relieve the throbbing pain and tension in her
back and hip. She then gets the children out of bed, gives her
son a nebulizer treatment and prepares breakfast. After her

_____

[6]With respect to knee pain, plaintiff testified that she
underwent knee surgery for severe arthritis in May 2004; that she
was informed by the surgeon that, despite surgery, the pain in
her knee would return; that her knee "locks" if she "work[s] the
leg too much;" and that when her knee locks, she needs a cane to
get around the house and is unable to go up and down stairs. (R.
57, 61-62, 84).

[7]Plaintiff testified that she also suffers from asthma for
which she uses inhalers, but that the asthma would not prevent
her from working. (R. 66).

6

daughter goes to school, plaintiff takes her son into the livingroom to play by himself for an hour while she stretches out on the couch and relaxes. Plaintiff then plays with her son for about an hour until lunchtime. After lunch, plaintiff takes her son back into the livingroom to watch cartoons while she relaxes again. From approximately 1:00 p.m. to 2:30 p.m., plaintiff's son naps and she either washes the breakfast and lunch dishes or watches television. At 3:00 p.m., plaintiff walks to the bus stop to meet her daughter who then plays with her brother while plaintiff starts dinner. After dinner, plaintiff has "quiet time" with her children for about an hour and a half. Then, the children take their baths and the family has more quiet time until bedtime. (R. 66-69).

Plaintiff goes grocery shopping with her parents once a month.[8] (R. 69). She does not attend church or belong to any groups or organizations. (R. 71). Occasionally, plaintiff's sister, who lives nearby, visits her. (R. 71). Plaintiff has no friends with whom she maintains contact. (R. 72). As to hobbies, plaintiff likes to draw and do arts and crafts.

---

[8]Plaintiff testified that she cannot go grocery shopping by herself because she cannot lift the groceries in and out of the car. In addition, if plaintiff begins to experience severe pain while shopping, her mother is available to drive home. Plaintiff also testified that her mother had been at her house everyday for the two years preceding the hearing, helping with the children and the household chores. (R. 70-71).

7

However, plaintiff has not engaged in these activities for awhile because she cannot sit for extended periods of time. (R. 79).

With respect to physical limitations as a result of her medical conditions, plaintiff can walk about three blocks before her hip starts pinching and burning. (R. 73). Plaintiff can stand for 15 to 20 minutes before she has to sit down, and plaintiff can sit for 20 minutes before she has to shift positions. Plaintiff cannot lift her son who weighs 25 pounds; however, she can carry a gallon of milk. (R. 77-78). Due to difficulties dressing herself, plaintiff has had to make some modifications, such as buying slip-on shoes and bigger socks because bending over is difficult for her. (R. 81).

## C. Medical Evidence in the Record

The administrative record in this case contains the following medical evidence relating to plaintiff's claim of disabling back pain:[9]

---

[9]In the brief filed in support of her motion for summary judgment, plaintiff concedes that the ALJ's findings with respect to her depression and history of knee pain are supported by substantial evidence. Therefore, plaintiff's arguments are limited to her allegation of disabling back pain. (Pl's Brief in Support, p. 6). Under the circumstances, the Court's summary of the medical evidence in this case will be limited to her complaints of, and treatment for, back pain.

**1. Records of Centerville Clinic - 11/6/00 and 12/8/00**

The records of Centerville Clinic show that plaintiff saw her family doctor, Anita Macdonald, M.D., on November 6, 2000 for a complaint of lower back pain of two weeks' duration with occasional numbness down her legs. In her office notes, Dr. Macdonald indicated that plaintiff has a history of chronic back pain which began after a swimming accident in 1991. Plaintiff's physical examination revealed (a) tenderness in the lumbar area - greater on the left, (b) decreased extension and flexion, (c) pain with lateral bending - greater on the right than left - with some limitation of movement, (d) normal and symmetric deep tendon reflexes, (e) motor strength of 5/5, (f) intact sensation bilaterally, and (g) equivocal straight leg raising test - some pain on the left. Dr. Macdonald's impression was acute back pain superimposed on a chronic back problem. Ibuprofen 800 mg. and Flexeril were prescribed for plaintiff, and she was instructed to use a heating pad 3 to 4 times a day and not to lift anything. (R. 242).

On December 8, 2000, plaintiff saw Dr. Macdonald to follow-up on her back pain. Plaintiff reported that her back pain had not improved significantly; that she had good days and bad days depending on her activities during the day; and that she still experienced shooting pains into her right leg with numbness. Plaintiff's physical examination continued to reveal tenderness

9

over the paraspinous muscles of the lumbar spine on the right,
although her straight leg raising test was negative, her deep
tendon reflexes were symmetric and her toe and heel standing
sensation was normal bilaterally.  Dr. Macdonald's impression was
chronic back pain, and she referred plaintiff for physical
therapy.  (R. 241).

### 2.  MRI Report - 2/19/03

On February 19, 2003, plaintiff underwent an MRI of the
lumbar spine for low back pain radiating into the right leg.  The
impression of the MRI was described as follows:

    IMPRESSION:    MILD RIGHT PARACENTRAL DISC PROTRUSION AT THE
                   L4-L5 LEVEL SLIGHTLY NARROWING THE RIGHT EXIT
                   FORAMEN.
                   NO EXTRUDED OR FREE DISC FRAGMENT NOR IS
                   THERE EVIDENCE OF SPINAL STENOSIS.

(R. 234).

### 3.  Record of The Orthopedic Group - 3/21/03

On March 21, 2003, plaintiff saw Dr. Alexander Kandabarow of
The Orthopedic Group for complaints of neck, back and right leg
pain.  Plaintiff told Dr. Kandabarow that she had suffered from
back pain since a swimming accident in 1991; that she developed
leg pain in September 2001; that over the previous few months,
the pain had worsened; and that her pain increased with sitting
and activity.  Following his physical examination of plaintiff,
Dr. Kandabarow's impression was "[r]ight chronic low back pain
associated with multi-level degenerative disc disease, right leg

10

pain due to right L4-5 disc herniation." Dr. Kandabarow
recommended a right L4-5 discectomy and possible extra foraminal
discectomy, and plaintiff indicated that she would like to
schedule surgery in the near future. (R. 322).

**4. Records of Monongahela Valley Hospital - 4/14/03 to
4/16/03**

On April 14, 2003, Dr. Kandabarow performed a right L4-5
microdiscectomy on plaintiff at Monongahela Valley Hospital for
her diagnosis of a right L4-5 herniated nucleus pulposus.
Plaintiff tolerated the procedure well and there were no
complications. She was discharged from the hospital on April 16,
2003. (R. 262-75).

**5. Record of The Orthopedic Group - 4/25/03**

Plaintiff saw Dr. Kandabarow for a follow-up visit on April
25, 2003, reporting that her pre-operative leg pain had resolved,
but that she still had some right-sided back and buttock pain.
During her physical examination, plaintiff was able to ambulate
without a limp and her straight leg raising test was negative.
Dr. Kandabarow described plaintiff's overall progress as
satisfactory, and he indicated that she could start physical
therapy. (R. 321).

11

**6.  Records of Orthopedic & Sports Physical Therapy Associates, Inc. - 5/8/03 to 6/6/03**

On May 8, 2003, plaintiff began physical therapy at Orthopedic & Sports Physical Therapy Associates, Inc. in connection with her lumbar discectomy.  During her initial session, plaintiff reported that she had total pain relief immediately following the back surgery, but that she began to experience pain in her right hip and calf two weeks after surgery.  Plaintiff also reported back stiffness, tingling in her right posterior calf and difficulty sleeping.  Plaintiff's rehabilitation potential was described as "good," and she attended physical therapy 3 times a week for 4 weeks.  (R. 288-300).

**7.  Records of The Orthopedic Group - 8/8/03 and 9/19/03**

Plaintiff saw Dr. Kandabarow for another follow-up visit on August 8, 2003, indicating that she was experiencing right lower extremity pain.  Plaintiff's physical examination revealed intact strength, but a positive straight leg raising test on the right. (R. 320).  Because of the pain, Dr. Kandabarow ordered an MRI of plaintiff's lumbar spine, which was performed on August 22, 2003. The impression of the MRI was described as follows: "MILD CENTRAL DISC PROTRUSION NOTED AT THE L5-S1 LEVEL.  NO RECURRENT DISC AT L4-5 LEVEL."  (R. 324).

12

During her next follow-up visit with Dr. Kandabarow on September 19, 2003, plaintiff reported "mostly back pain now, some right lower extremity pain which she can live with." On examination, plaintiff's straight leg raising test was negative and her reflexes were intact. In his office notes, Dr. Kandabarow noted that, based on her recent MRI, plaintiff could have "some extra-foraminal type of disc bulge which may be irritating the right L4 root in that region. However, this is questionable." Dr. Kandabarow recommended continued non-operative treatment, gave plaintiff a prescription for Darvocet, and stated that he would see plaintiff again if her symptoms worsened in the future. (R. 319).

### 8. X-Ray Report - 11/12/03

On November 12, 2003, plaintiff underwent x-rays of her cervical, thoracic and lumbosacral spines. The x-ray of plaintiff's cervical spine suggested muscle spasm, but no acute bone injury. The x-ray of plaintiff's thoracic spine showed no significant abnormality, and the x-ray of plaintiff's lumbar spine was within normal limits. (R. 332).

### 9. Record of The Orthopedic Group - 2/18/04

Plaintiff saw Dr. Kandabarow for another follow-up visit on February 18, 2004. Plaintiff reported continued back pain, despite doing home exercises and trying to lose weight. Plaintiff's physical examination revealed that her forward

13

flexion was diminished by 30%, although her straight leg raising test was negative and her strength was intact.  Dr. Kandabarow noted his suspicion that plaintiff's increased back pain was due "mostly" to discogenic changes.  Plaintiff was instructed to continue the home exercises and non-steroidal anti-inflammatories.  (R. 378).

### 10.  Report of Richard S. Kaplan, M.D. - 2/23/04

On February 23, 2004, plaintiff underwent a consultative examination by Dr. Richard S. Kaplan, a Board-certified physiatrist, at the request of the Pennsylvania Bureau of Disability Determination.  Plaintiff's complaints at that time included "neck pain, upper trapezius pain, low back pain, right hip pain, right calf pain, in addition to numbness in the lateral aspect of the right calf."  With respect to plaintiff's physical examination, Dr. Kaplan noted, among other things, that plaintiff "was seen independently ambulating into the examination room with a nonantalgic gait and no gait aid;" that plaintiff had tenderness upon palpation on the right S1 joint, the right lumbar paraspinal muscles and the sacrum; that plaintiff's lumbar spine range of motion "was to 60 [degrees] flexion, 10 [degrees] extension and 20 [degrees] of lateral bending bilaterally;" that "[s]itting straight leg raise was positive for right hip pain bilaterally at 70 [degrees];" and that plaintiff was able to

14

perform toe walking independently, but that she was only able to
take one step of heel walking due to loss of balance.

With respect to plaintiff's functional limitations, Dr.
Kandabarow stated:

> I reviewed with Mrs. Nicklow her current functional
> limitations. She states that she is unable to perform
> prolonged sitting, standing, or walking due to intermittent
> back and lower extremity pain. At this time she is
> currently undergoing treatment regarding a possible medial
> meniscus tear in the right knee. Due to the patient's
> ongoing medical treatment and possible medial meniscus tear,
> we are unable to determine permanent limitations at this
> time. Therefore I cannot establish permanent limitations at
> this time including lifting, carrying, standing, walking,
> sitting, pushing, pulling, or environmental restrictions.

(R. 366-72).

### 11. Records of Delia Melton, M.D. - 4/7/03 to 8/12/04

Between April 7, 2003 and August 12, 2004, plaintiff saw Dr.
Delia Melton, her primary care physician, on nineteen occasions.
The records of these office visits reflect treatment for
consistent complaints of back pain by plaintiff. (R. 417-35).

### 12. Letter of Stephen Bloomfield, M.D. - 8/13/04

Based on a referral from Dr. Melton, plaintiff was evaluated
by Dr. Stephen Bloomfield, a neurosurgeon, on August 13, 2004.
In a letter to Dr. Melton, Dr. Bloomfield described his
impression after examining plaintiff as follows:

> CLINICAL IMPRESSION: The patient appears to have significant
> right leg pain and some low back pain secondary to chronic
> radiculitis that has failed to gain adequate benefits from
> surgical decompression and physical therapy and medication
> management. I feel that this may respond well to pain

15

clinic efforts with epidural steroid injections.   I am
taking the liberty of referring her there as well as
recommend that she continue her nonsteroidal anti-
inflammatory agent, Vioxx, and supplement that as need be
with muscle relaxant medication.  I feel it would be a good
idea for her to stay off chronic narcotic medications as you
have been successful to do so in the past.  I will see her
back in a few months to evaluate her progress and keep you
informed.

(R. 440-41).

### 13.  Report of William W. Frost, M.D. - 9/23/04

Plaintiff was referred by Dr. Bloomfield to the Jefferson

Pain and Rehabilitation Center where she was seen by Dr. William

W. Frost on September 23, 2004.  In a letter to Dr. Bloomfield, a

copy of which was sent to Dr. Melton, plaintiff's primary care

physician, Dr. Frost noted that plaintiff's chief complaint at

the time of her evaluation was "leg pain greater than back pain

bilaterally with the right greater than left" and difficulty

sleeping,[10] and that plaintiff tested positive for L3-4-5 nerve

root irritation and nerve root involvement status post

discectomy.  Dr. Frost also noted that plaintiff indicated she

could walk about an hour with stops, stand about 30 to 45 minutes

and sit for 30 minutes with frequent position changes.  Dr. Frost

described plaintiff's physical examination as follows:

Lumbar exam reveals a loss of normal lordosis and she
is able to ambulate on heel and tip toe.  She is able to
squat and arise but with increased pain in the right hip.

---

[10]On a scale of 1 to 10, plaintiff rated her pain as 7-8.
(R. 412).

16

She has no limping gait.  Forward bending of the back is 90/90 degrees with terminal low back pain.  Backward bending of the back is 30/35 degrees with increasing low back pain. Right side bending of the back is 20/35 degrees and left side bending of the back is 25/35 degrees.  Straight-leg raising in the seated position was unremarkable.  Straight-leg raising in the supine position was 45/90 degrees in the right lower extremity, and on the left was 45/90 degrees with hip pulling and pain in the right low back and hip.  We have a crossed straight-leg raising sign.

Dorsal examination reveals sciatica and bilateral S1 was 4+/4 in tenderness with objective conformation.  Finally bilateral L4-5 and S1 nerve roots were significantly 3-4+/4.

Dr. Frost's diagnoses included (1) lumbalgia, lumbago and

sciatica, (2) bilateral lumbosacral radiculitis/radiculopathy,

especially L4-5 and S1, and (3) status post nerve surgical

repairs and post-operative changes, and he treated plaintiff with

various injections.[11]  (R. 412-16).

---

[11]Dr. Frost described the type of injections administered to plaintiff as follows:

PLAN OF TREATMENT:  I advised her that her S1 dysfunctions were associated with tethering of the L5 nerve roots bilaterally as well as involvement of the original pathologies.  These joints were blocked with Lidocaine, Marcaine, and Medrol under informed consent and aseptic technique.  Also the bilateral L4-5, L5-S1 and S1-S2 nerve roots were disinflamed with Lidocaine, saline, and Medrol. The patient experienced excellent relief with these procedures.  Regarding the sciatica she received a caudal epidural block, which was quiet (sic) effective.  I discontinued previous medications and prescribed Vicodin timed release, HCD 20/200 APAP one q8hs.  I think this will be quite helpful for her.  I will see her again in about another month or so and will let you know how she is doing.

(R. 415).

17

**14. Physical Capacities Questionnaire - 10/12/04**

On October 12, 2004, Dr. Melton, plaintiff's primary care
physician, completed a Medical Questionnaire to Determine
Physical Capacities on plaintiff's behalf, indicating, in
summary, that plaintiff (1) could sit less than 2 hours in an 8-
hour workday; (2) could stand less than 1 hour in an 8-hour
workday; (3) could walk less than 2 hours in an 8-hour workday;
(4) must alternate positions frequently because walking more than
30 minutes or sitting more than 20 minutes causes pain; (5) could
occasionally bend, stoop and balance; (6) could not crawl, climb,
crouch or kneel; (7) could not use her right foot for repetitive
pushing and pulling of leg controls; (8) could frequently lift up
to 10 pounds and occasionally lift up to 25 pounds; and (9)
required one 10-minute rest period per hour of work. (R. 436-
39).

**15. Progress/Consultation Report of Dr. Frost - 11/22/04**

During her next appointment with Dr. Frost on November 22,
2004, plaintiff reported continued complaints of pain of the same
intensity and frequency, although she could bend and touch the
floor. Plaintiff's straight leg raising test was positive on the
right, and she exhibited tenderness at the S1 level. As a
result, Dr. Frost administered another series of injections. (R.
416).

18

## D. **Vocational Expert Testimony**

During the hearing on plaintiff's applications for DIB and SSI, the ALJ posed three hypothetical questions to the VE. However, as noted by plaintiff, only 2 of the 3 hypothetical questions are relevant for purposes of this appeal. (Pl's Brief in Support, p. 10). In the first hypothetical question, the ALJ asked the VE to assume a hypothetical individual with the ability to perform light work who (a) could stand for 30 minutes at a time before having to sit down for a few minutes, (b) could stand and walk for 6 hours in an 8-hour workday, (c) could sit for 6 hours in an 8-hour workday but would be limited to sitting for one hour at a time, and (d) would be limited to only occasional contact with co-workers and the general public. The ALJ then asked the VE whether the hypothetical individual could perform any unskilled jobs in the local or national economy. The VE responded affirmatively, identifying the jobs of office helper and mail clerk. (R. 102-04).

In the second relevant hypothetical question, the ALJ asked the VE to assume a hypothetical individual of plaintiff's age, education and work experience who (a) would be limited to sitting for 2 hours in an 8-hour workday, standing 1 hour in an 8-hour workday and walking 2 hours in an 8-hour workday, and (b) must

19

lie down the remaining 3 hours of an 8-hour workday.[12]  In

response to the ALJ's question whether there would be any full-

time, unskilled work that this hypothetical individual could

perform, the VE answered "no."  (R. 105).

## III. Legal Analysis

### A.   Jurisdiction and Standard of Review

The Court has jurisdiction of this appeal under 42 U.S.C.

§ 405(g) and § 1383(c)(3) (incorporating Section 405(g)), which

provide that an individual may obtain judicial review of any

final decision of the Commissioner by bringing a civil action in

the district court of the United States for the judicial district

in which the plaintiff resides.

The Court's review of the Commissioner's decision is limited

to determining whether the decision is supported by substantial

evidence, which has been described as "such relevant evidence as

a reasonable mind might accept as adequate to support a

conclusion."  Richardson v. Perales, 402 U.S. 389, 401 (1971).

It consists of something more than a mere scintilla, but

something less than a preponderance.  Dobrowolsky v. Califano,

606 F.2d 403, 406 (3d Cir.1979).  Even if the Court would have

---

[12]As noted by plaintiff, this hypothetical question was based
on the Medical Questionnaire to Determine Physical Capacities
completed on plaintiff's behalf by her primary care physician,
Dr. Melton, on October 12, 2004.  (Pl's Brief in Support, p. 10,
R. 105-07, 436-39).

decided the case differently, it must accord deference to the

Commissioner and affirm the findings and decision if supported by

substantial evidence.    Monsour Medical Center v. Heckler, 806

F.2d 1185, 1190-91 (3d Cir.1986).

## B. The 5-Step Sequential Evaluation Process

In Burnett v. Commissioner of Social Security Admin., 220

F.3d 112 (3d Cir.2000), the Third Circuit discussed the procedure

an ALJ must follow in evaluating a claim for Social Security

disability benefits, stating in relevant part:

\*    \*    \*

In Plummer, we recounted the five step sequential
evaluation for determining whether a claimant is under a
disability, as set forth in 20 C.F.R. § 404.1520:

In step one, the Commissioner must determine
whether the claimant is currently engaging in
substantial gainful activity.  20 C.F.R. § 404.1520(a).
If a claimant is found to be engaged in substantial
gainful activity, the disability claim will be denied.
Bowen v. Yuckert, 482 U.S. 137, 140, 107 S.Ct. 2287,
2290-91, 96 L.Ed.2d 119 (1987).  In step two, the
Commissioner must determine whether the claimant is
suffering from a severe impairment.  20 C.F.R.
§ 404.1520(c).  If the claimant fails to show that her
impairments are "severe," she is ineligible for
disability benefits.

In step three, the Commissioner compares the
medical evidence of the claimant's impairment to a list
of impairments presumed severe enough to preclude any
gainful work.  20 C.F.R. § 404.1520(d).  If a claimant
does not suffer from a listed impairment or its
equivalent, the analysis proceeds to steps four and
five.  Step four requires the ALJ to consider whether
the claimant retains the residual functional capacity
to perform her past relevant work.  20 C.F.R.
§ 404.1520(d).  The claimant bears the burden of

21

demonstrating an inability to return to her past relevant work. <u>Adorno v. Shalala</u>, 40 F.3d 43, 46 (3d Cir.1994).

    If the claimant is unable to resume her former occupation, the evaluation moves to the final step.  At this stage, the burden of production shifts to the Commissioner, who must demonstrate the claimant is capable of performing other available work in order to deny a claim of disability.  20 C.F.R. § 404.1520(f). The ALJ must show there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with her medical impairments, age, education, past work experience, and residual functional capacity.  The ALJ must analyze the cumulative effects of all the claimant's impairments in determining whether she is capable of performing work and is not disabled.

<u>Plummer</u>, 186 F.3d at 428.

\*   \*   \*

220 F.3d at 118-19.

    With respect to the ALJ's application of the five-step

sequential evaluation process in the present case, step one was

resolved in plaintiff's favor in part.  Specifically, the ALJ

found that plaintiff had engaged in substantial gainful activity

between September 1, 2002 and December 7, 2002.  Therefore, he

limited the periods to be considered with respect to plaintiff's

claim of disability to November 1, 2000 through September 1, 2002

and since December 8, 2002.  (R. 16-17).  Turning to step two,

the ALJ found that plaintiff suffers from the following severe

impairments: "low back/failed back syndrome, status post L4-L5

discectomy; residuals, status post arthroscopic surgery to the

22

right knee; asthma; and major depressive disorder." (R. 17). As
to step three, the ALJ found that plaintiff's impairments,
considered singly or in combination, do not meet or equal any of
the listed impairments in Appendix 1 to Subpart P of Part 404 of
the Social Security Regulations. (R. 17-20). With regard to
step four, the ALJ found that, during the relevant time periods,
plaintiff retained the RFC to perform the demands of light work
with certain modifications,[13] but that this RFC precluded
plaintiff's performance of her past relevant work due to the
physical and/or mental demands of such work. (R. 20-25).
Finally, at step five, based on the VE's testimony in response to
the first hypothetical question, the ALJ found that, considering
plaintiff's age, education, work history and RFC, she was capable
of making a successful adjustment to work existing in significant

_____

[13]The Social Security Regulations define "light work" as
follows: "Light work involves lifting no more than 20 pounds at a
time with frequent lifting or carrying of objects weighing up to
10 pounds. Even though the weight lifted may be very little, a
job is in this category when it requires a good deal of walking
or standing, or when it involves sitting most of the time with
some pushing and pulling of arm or leg controls. To be
considered capable of performing a full or wide range of light
work, you must have the ability to do substantially all of these
activities. If someone can do light work, we determine that he
or she can also do sedentary work, unless there are additional
limiting factors such as loss of fine dexterity or inability to
sit for long periods of time." See 20 C.F.R. § 404.1567(b).

23

numbers in the national economy.   Therefore, plaintiff was not
disabled.   (R. 25-27).

## C. Onset Date of Disability

As an initial matter, the Court must address the ALJ's
determination at step one of the sequential evaluation process
that the periods to be considered with regard to plaintiff's
claim of disability are November 1, 2000 to September 1, 2002 and
since December 8, 2002, because plaintiff's employment as an
internet bank agent between September 1, 2002 and December 7,
2002 constituted substantial gainful activity.[14]

In her applications for DIB and SSI, which were filed on
December 22, 2003 with a protective filing date of December 17,
2003, plaintiff alleged that she became disabled on November 1,
2000.   (R. 127, 442).   However, in a Disability Report completed
on December 18, 2003, plaintiff indicated that she became
disabled on January 1, 2002.   (R. 163).   Due to the conflicting
onset dates, the ALJ sought a clarification at the commencement
of the hearing, and plaintiff's counsel indicated that the
correct onset date of plaintiff's disability is January 1,

_____

[14]In this appeal, plaintiff does not challenge the ALJ's
finding that she engaged in substantial gainful activity between
September 1, 2002 and December 7, 2002, and the Court notes that
this finding is consistent with Disability Reports completed by
plaintiff on December 18, 2003 and January 8, 2004 in which
plaintiff indicated that she quit working on December 7, 2002.
(R. 155, 163).

24

2002.[15]   (R. 34).   Despite this clarification on the record, the ALJ based his decision on an alleged onset date of disability of November 1, 2000, which is clearly erroneous.   (R. 17).

Further, in order to establish a disability under the Social Security Act, a claimant must demonstrate an inability to engage in any substantial gainful activity due to a medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than 12 months.   See 42 U.S.C. § 423(d)(1).   Utilizing January 1, 2002 as the alleged onset date of plaintiff's disability and excluding the period between September 1, 2002 and December 7, 2002 due to plaintiff's substantial gainful activity during that period, the first period of disability at issue in this case is January 1, 2002 to September 1, 2002, which is less than twelve months.   Therefore, plaintiff is not eligible for disability benefits for this period, and, on remand, the ALJ's consideration of plaintiff's

---

[15]In this connection, the Court notes that an onset date of disability of January 1, 2002 is consistent with plaintiff's testimony during the hearing that "the nerves started pinching ... in November of 2001;" that she started complaining to her family physician about the pain in November 2001; and that the pain "just got progressively worse from that point on" (R. 53), as well as a questionnaire completed by plaintiff on January 11, 2004, in which she indicated that her pain began in November of 2001.   (R. 189).

claim of disabling back pain should be limited to the period commencing December 8, 2002.[16]

## D. **Plaintiff's Arguments in Support of Summary Judgment**

Plaintiff raises three arguments in support of her motion for summary judgment. First, plaintiff asserts that the ALJ erred by failing to give controlling weight to the opinion of Dr. Melton, her treating physician, concerning the functional limitations resulting from her back pain which were set forth in the Medical Questionnaire to Determine Physical Capacities completed on October 12, 2004. Second, plaintiff asserts that even if Dr. Melton's opinion concerning her functional limitations is not entitled to controlling weight, the ALJ erred by failing to inquire further into the deference to be accorded such opinion.[17] Third, plaintiff asserts that testimony of the VE on which the ALJ relied to deny her applications for DIB and SSI was based on a hypothetical question lacking support in any

---

[16]As noted previously, plaintiff concedes in this appeal that the ALJ's findings regarding her depression and knee condition are supported by substantial evidence. (Pl's Brief in Support, p. 6). Thus, on remand, the ALJ may limit his determination to plaintiff's claim of disabling back pain.

[17]In connection with plaintiff's second argument, she maintains that Dr. Melton's opinion is entitled to significant deference because it is consistent with the other medical evidence of record and uncontradicted by any other medical opinion of record. (Pl's Brief in Support, pp. 23-26).

26

medical opinion of record and, therefore, cannot be considered substantial evidence supporting the ALJ's decision.[18]

i

Turning to plaintiff's first argument, Section 404.1527(d) of the Social Security Regulations provides that (1) the opinion of a treating source on the issues of the nature and severity of a disability claimant's impairment is entitled to controlling weight when the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record," and (2) the Social Security Administration "will always give good reasons in our notice of determination or decision for the weight we give [the claimant's] treating source's opinion." See 20 C.F.R. § 404.1527(d)(2).

In his decision, the ALJ stated that he could not give controlling weight to Dr. Melton's opinion concerning plaintiff's functional limitations because, although she has an established treatment relationship with plaintiff, (a) Dr. Melton is not an orthopedist or a neurologist, (b) Dr. Melton was not the primary treating source of plaintiff's back impairment, (c) Dr. Melton's treatment notes consist primarily of a recitation of plaintiff's

---

[18]Plaintiff maintains that the most appropriate disposition of this appeal is reversal. In the alternative, plaintiff seeks a remand for further consideration of her applications for DIB and SSI.

27

subjective complaints and do not contain the detailed clinical findings related to plaintiff's back impairment that were reported by the other examiners, and (d) Dr. Melton based her opinion concerning plaintiff's functional limitations solely on plaintiff's subjective complaints.

After consideration, the Court agrees with plaintiff that the ALJ failed adequately to explain why Dr. Melton's opinion concerning plaintiff's functional limitations was not well-supported by medically acceptable clinical and laboratory diagnostic techniques - the first prong of the test of whether a treating source's opinion is entitled to controlling weight - in light of the following evidence of record:

(1) the record of The Orthopedic Group dated August 8, 2003, which reflects continued complaints of back pain, as well as a positive straight leg raising test on the right, following plaintiff's right L4-5 microdiscectomy;

(2) the results of the August 22, 2003 MRI ordered by Dr. Kandabarow due to plaintiff's continued complaints of pain and positive test results, which indicated that, although plaintiff did not have a recurrent disc problem at the L4-5 level, she had a mild central disc protrusion at the L5-S1 level;

(3) the record of The Orthopedic Group dated February 18, 2004, which reflects continued complaints of back pain,

28

as well as diminished forward flexion upon physical examination;

(4) the office notes relating to Dr. Melton's regular treatment of plaintiff for back pain between April 7, 2003 and August 12, 2004, which included spinal manipulations and various prescription pain medications;

(5) the referrals made and tests ordered by Dr. Melton for plaintiff's back pain between April 7, 2003 and August 12, 2004, which included orthopedic and neurologic referrals and an MRI;

(6) the letter of Dr. Bloomfield, a neurosurgeon, to Dr. Melton on August 13, 2004, which validated plaintiff's complaints of significant low back and right leg pain secondary to chronic radiculitis and recommended her referral to a pain clinic;

(7) the letter of Dr. Frost, a pain management specialist, to Dr. Bloomfield on September 23, 2004 (which was copied to Dr. Melton), reporting that plaintiff tested positive for L3-4-5 nerve root irritation and nerve root involvement status post discectomy and describing the injections administered to plaintiff; and

(8) the report of Dr. Frost dated November 22, 2004, reflecting continued complaints of pain by plaintiff, a

29

positive straight leg raising test on the right and

administration of another series of injections.

In addition, the Court agrees with plaintiff that the ALJ failed to identify with sufficient specificity the substantial evidence which he found to be inconsistent with Dr. Melton's opinion concerning the functional limitations resulting from her back and right leg pain - the second prong of the test of whether a treating source's opinion is entitled to controlling weight. (Pl's Brief in Support, pp. 19-20).

Under the circumstances, the matter will be remanded for the ALJ to provide an adequate explanation of the reasons for his failure to accord controlling weight to Dr. Melton's opinion concerning plaintiff's functional limitations in accordance with 20 C.F.R. § 404.1527(d)(2).

ii

With respect to plaintiff's second argument, the Court also agrees with plaintiff that even if Dr. Melton's opinion concerning her functional limitations is not entitled to controlling weight, the ALJ erred by failing to inquire further into the deference that should be given to the opinion.[19]  As

---

[19]As noted by plaintiff, the Commissioner failed to address plaintiff's second argument in the brief filed in support of her cross-motion for summary judgment.  (Pl's Reply Brief).

30

noted by plaintiff, Social Security Ruling 96-2p provides in relevant part:

\* \* \*

Adjudicators must remember that a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. 404.1527 and 416.927. In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

\* \* \*

Accordingly, on remand, if the ALJ again determines that Dr. Melton's opinion regarding the functional limitations resulting from plaintiff's back and right leg pain is not entitled to controlling weight, he should apply all of the factors referred to in 20 C.F.R. § 404.1527(d)(2) and determine the appropriate weight or deference to be given to the opinion.[20]

---

[20]In this connection, the Court notes its further agreement with plaintiff that the absence of a medical opinion contradicting Dr. Melton's opinion is "very significant." (Pl's Brief in Support, p. 25). As noted previously, although plaintiff was referred to Dr. Richard S. Kaplan for a consultative examination and report, Dr. Kaplan specifically declined to render an opinion concerning plaintiff's functional limitations based on her ongoing treatment for a possible medial meniscus tear of the right knee. In light of plaintiff's subsequent knee surgery and indication that she is no longer claiming disability based on knee pain, on remand, the ALJ should order a further consultative examination of plaintiff to obtain another opinion regarding the functional limitations resulting

iii

Finally, regarding plaintiff's third argument, the Court also agrees with plaintiff that the VE's testimony in response to the ALJ's first hypothetical question does not constitute substantial evidence supporting the ALJ's decision to deny plaintiff's applications for DIB and SSI. Simply put, there is no medical opinion of record to support the functional limitations set forth in the ALJ's first hypothetical question. Rather, the question appears to be based on the ALJ's own personal assessment of plaintiff's functional limitations. As noted by plaintiff, such "lay medical opinions" are impermissible. Accordingly, as noted in footnote 20, on remand, the ALJ should order a further consultative examination of plaintiff to obtain an opinion concerning the functional limitations resulting from her back and right leg pain and schedule a supplemental hearing to elicit further VE testimony concerning the existence of a significant number of jobs in the national economy which plaintiff can still perform despite the limitations resulting from her back and right leg pain.

_W. Mian L. Standish_
William L. Standish
United States District Judge

Date: December 5, 2006

---

from her back and right leg pain.

32